Affirmed and Opinion filed September 21, 2004









Affirmed and Opinion filed September 21, 2004.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-03-00369-CR

____________

 

BRIAN DAVID CROFT, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 122nd
District Court

Galveston County, Texas

Trial Court Cause No. 02CR0436

 



 

O P I N I O N

The jury convicted appellant Brian David
Croft of sexual assault of a child and assessed punishment at sixteen years
confinement and a $10,000 fine.  See
Tex. Pen. Code Ann. ' 22.011(a)(2)
(Vernon Supp. 2004).  Appellant raises
five issues on appeal.  We affirm. 

Factual and
Procedural Background








Appellant and A.C., a thirteen-year-old
girl, met in an online chat room in May or June of 2001.  They began talking on the phone, e-mailing,
and instant-messaging each other at least every over day.  A.C. told appellant she was thirteen when
they first met in the chat room, and appellant told A.C. he was 22 years
old.  On July 25, 2001, A.C.=s fourteenth
birthday, appellant asked A.C. to be his girlfriend.  Sometime after her birthday, appellant told
A.C. he was actually in his thirties. 
Appellant asked A.C. not to tell anyone about their relationship because
he would get into trouble and may go to jail. 
She kept the relationship a secret because she believed they loved each
other.  

Appellant and A.C. agreed to meet on
Saturday, September 22, 2001.  A.C.
testified that she wanted to look her best when she met appellant for the first
time.  On appellant=s suggestion, she
shaved her genital area to look like a picture of a nude woman he had sent her
earlier.  They agreed that A.C. would
walk to Hobby Airport and appellant would pick her up.  On the morning of September 22, they
contacted each other by phone at approximately 5:00 or 5:30.  A.C. was unable to walk to Hobby Airport because
it was raining, so A.C. gave appellant directions to her house.  A.C. was in the bathroom while she was
talking with appellant on the phone when her mother, Marylou, came into the
bathroom to get ready for work.  She
asked A.C. to leave the bathroom and then began taking a shower.  At approximately 5:45 a.m., while her mother
was in the shower, A.C. left the apartment and met appellant on a nearby side
street.  

Appellant and A.C. went to Galveston, and
appellant parked his car on the seawall. 
They started kissing, and appellant unzipped A.C.=s pants and put
his fingers inside of her vagina.  A.C.
asked to see his genitals, so he unzipped his pants and then started
masturbating.  After he ejaculated, he
grabbed a t-shirt from the backseat and wiped himself off.  








Appellant and A.C. left the seawall and
drove to a nearby Wal-Mart, where they 
bought a disposable camera.  After
taking pictures of each other, they decided to go see a movie, but because it
was approximately 9:00 in the morning, the movie theater was not open.  Appellant then took A.C. to an abandoned
building, where they started kissing again. 
Appellant unzipped A.C.=s pants and asked
her to pull her pants down to her knees. 
Appellant put his fingers inside of A.C.=s vagina and then
unzipped his pants and asked her to perform oral sex on him, which she
did.  Appellant performed oral sex on
A.C. and then tried to have sex with her. 
Appellant inserted his penis into A.C. a couple of inches, but he
withdrew his penis when A.C. told him that it was hurting her.  Appellant then ejaculated on A.C.=s genitals.  A.C. wiped her genitals with the same tee
shirt appellant used earlier.

After Marylou took her shower, she became
alarmed with A.C.=s disappearance because it was very early
on Saturday morning and it was not like A.C. to leave the apartment without
telling someone.  While Marylou and her
family were searching for A.C., A.C.=s older sister
found a piece of paper in the trash containing appellant=s name and phone
number.  Marylou then looked up appellant=s driver=s license number
and address on the computer from a website which publishes public information.  Marylou 
also found an e-mail from appellant to A.C. written during the previous
week, stating that he could not wait until Saturday.  Thereafter, Marylou informed the police about
appellant and her belief that A.C. was with him. 

After appellant and A.C. left the
abandoned building, appellant received a phone call from his live-in
girlfriend, Debra Kilgore.  Marylou,
along with her husband and other daughter, were at Kilgore=s house.  Kilgore gave the phone to Marylou who told
appellant that she knew A.C. was with him. 
Appellant repeatedly denied having A.C. with him, but eventually gave in
and said he would bring her back.  

As they were leaving Galveston, appellant
and A.C. tried to devise a plan to get A.C. back home without getting appellant
into trouble with the police.  They threw
the disposable camera out of the window and then, upon appellant=s suggestion,
placed the tee shirt containing appellant=s semen, in the
Wal-Mart bag and threw it out of the window. 
Appellant then took A.C. to a gas station in League City and called
Kilgore so that A.C. could tell her where she was located.  Once they learned A.C.=s whereabouts,
Officer Donald R. Patterson, a Pearland Police Officer present at Kilgore=s house, asked
Marylou to go to the police station while he recovered A.C.








While waiting for someone to pick her up,
A.C. went to the gas station=s bathroom and
cleaned her genitals.  Officer Patterson
found A.C. at the gas station, and on the way back to the police station,
Officer Patterson asked A.C. what happened. 
A.C. initially told Officer Patterson she and appellant had just talked
because that is what appellant told her to say, but she eventually decided to
tell him the truth.  Because the incident
took place in Galveston, Officer Patterson advised the family to go to the
Galveston Police Department. 

An officer with the Galveston Police
Department asked Marylou  to take A.C. to
the hospital for an examination, and after the examination, the officer took
Marylou=s and A.C.=s statement.  Thereafter, three officers with the Galveston
Police Department, A.C., and A.C.=s parents left the
police station to try to find the discarded evidence.  They were able to locate the Wal-Mart bag
containing the tee shirt and a receipt for a camera purchased earlier that
day.  

The Texas Department of Public Safety
Houston Crime Lab tested the tee shirt and A.C.=s clothing for the
presence of semen.  The tee shirt, A.C.=s panties, and
A.C.=s shirt tested
positive for semen.  The crime lab then
performed DNA analysis on the tee shirt and A.C.=s panties.  The semen found on the tee shirt matched
appellant=s DNA profile, but the DNA analyst was
unable to obtain a DNA profile, other than A.C.=s, from the
panties.  The DNA analyst did not examine
A.C.=s shirt.  A.C.=s medical
examination did not reveal any signs of trauma or sexual activity; however, the
doctor concluded that neither could be ruled out. 








Appellant was indicted for sexual assault
of a child, and a jury found him guilty as charged in the indictment.  In five issues, appellant challenges his
conviction and punishment, contending (1) the trial court erred by omitting sex
offender registration requirements from the jury charge during punishment; (2)
the trial court improperly admitted expert witness testimony from the examining
physician; (3) the trial court improperly admitted expert witness testimony
from another physician; (4) the evidence is factually insufficient to establish
the elements of the charged offense; and (5) the jury charge during the
guilt/innocence stage of trial was defective because it was inconsistent with
the indictment and lowered the State=s burden of
proof.   

Discussion

I.        Jury
Charge During Punishment

In his first issue, appellant contends the
trial court erred by failing to include all of the requirements of sex offender
registration in the jury charge during punishment.  Appellant alleges that simply listing the
requirement that sex offenders register as a possible condition of community
supervision was incorrect and incomplete. 
Appellant requested the trial court to include in the jury charge a
complete description of all the requirements associated with sex offender
registration.  Appellant=s request was
denied.  Instead, the jury charge
provided the trial court may require appellant, as a condition of community
supervision, to register as a sex offender.[1]  Appellant contends in his brief that merely
stating that he would Ahave to register@ as a condition of
community supervision is misleading and deceptive to the jury because the actual
requirements of registration are much more onerous. 

A trial court is not required to submit
the statutory terms of community supervision in the jury charge on
punishment.  See Cortez v. State,
955 S.W.2d 382, 384 (Tex. App.CSan Antonio 1997,
no pet.); McNamara v. State, 900 S.W.2d 466, 467B68 (Tex. App.CFort Worth 1995,
no pet.); see also Yarbrough v. State, 779 S.W.2d 844, 845 (Tex. Crim.
App. 1989) (per curiam) (dismissing petition as improvidently granted and
expressly overruling Brass v. State, 643 S.W.2d 443 (Tex. App.CHouston [14th
Dist.] 1982, pet. ref=d), which 








had required inclusion of probation terms in the jury
charge).  Here, the jury was instructed
that it could recommend community supervision if it assessed not more than ten
years confinement, and that if the jury recommended community supervision, the
judge could impose certain conditions on appellant, which included a
non-exclusive list of general conditions. 
Appellant argues the inclusion of ARegister as a sex
offender@ as a general
condition of community supervision misled the jury because it did not provide
the other mandatory requirements associated with such registration.  

Appellant was convicted of sexual assault
of a child under section 22.011(a)(2) of the Texas Penal Code.  Chapter 62 of the Texas Code of Criminal
Procedure provides that a person who has a Areportable
conviction or adjudication@ shall register
with the local law enforcement authority in any municipality where the person
resides or intends to reside for more than seven days.  Tex.
Code Crim. Proc. Ann. art. 62.02(a) (Vernon Supp. 2004).  The term reportable conviction or
adjudication includes a conviction for a violation of Penal Code section
22.011, sexual assault.  Tex. Code Crim. Proc. Ann. art.
62.01(5)(A) (Vernon Supp. 2004).  Thus,
appellant was required to register as a sex offender, and comply with other
pertinent provisions of that chapter when Areleased,@ as that term is
defined in Code of Criminal
Procedure article 62.01(4).  Tex. Code Crim. Proc. Ann. art.
62.01(4). (Vernon Supp. 2004).








The flaw in appellant=s argument for
more specificity in the jury charge is that the registration requirement of
Chapter 62, applicable to a felon with a reportable conviction or adjudication,
becomes a condition of community supervision when a person required to register
as a sex offender is granted community supervision.  Tex.
Code Crim. Proc. Ann. art. 42.12, ' 11(e) (Vernon
Supp. 2004).  Under article 42.12 of the
Texas Code of Criminal Procedure, a judge granting community supervision to a
defendant required to register as a sex offender under Chapter 62 must  require that defendant, as a condition of
community supervision, to register under that chapter as a sex offender
with local law enforcement and submit a blood sample for the purpose of
creating a DNA record of the defendant.  Id.  Because the Chapter 62 registration
requirement is a condition of community supervision, all other applicable terms
of that chapter need not be listed in the jury charge at the punishment
stage.  Means v. State, 955 S.W.2d
686, 692 (Tex. App.CAmarillo 1998, pet. ref=d, untimely filed)
(holding trial court not required to provide a complete list of each and every
term and condition of probation); Cortez, 955 S.W.2d at 384 (holding
trial court not required to submit the statutory terms of probation in the jury
charge on punishment).

We conclude , therefore, the trial court
did not err in refusing to include the complete list of requirements for sex
offender registration in the jury charge at punishment.  Appellant=s first issue is
overruled.  

II.       Expert
Testimony

In his second and third issues, appellant
challenges the trial court=s admission of the
expert testimony of Dr. Mai and Dr. Lukefar. 


A.      Standard
of Review

We review the trial court=s decision to
admit or exclude scientific expert testimony under an abuse of discretion
standard.  Sexton v. State, 93
S.W.3d 96, 99 (Tex. Crim. App. 2002). 
The trial court abuses its discretion if it acts without reference to
any guiding rules and principles.  Montgomery
v. State, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990).  Thus, we will uphold the trial court=s decision as long
as it is within the zone of reasonable disagreement, given the evidence
presented and the requirements of Rule 702 of the Texas Rules of Evidence.  Sexton, 93 S.W.3d at 99.   








The trial court is guided by Texas Rule of
Evidence 702 in determining whether expert testimony should be admitted.  Kelly v. State, 824 S.W.2d 568, 572
(Tex. Crim. App. 1992).  Rule 702
provides: AIf scientific, technical, or other
specialized knowledge will assist the trier of fact to understand the evidence
or to determine a fact in issue, a witness qualified as an expert by knowledge,
skill, experience, training, or education may testify thereto in the form of an
opinion or otherwise.@  Tex. R. Evid. 702.  Rule 702 requires the proponent of the
testimony to establish (1) the scientific, technical, or other specialized
knowledge will aid the trier of fact, and (2) the expert is qualified to
testify on the subject.  Gregory v.
State, 56 S.W.3d 164, 178 (Tex. App.CHouston [14th
Dist.] 2001, pet. dism=d). 

Under the first prong, the evidence is
admissible only if the proponent of the scientific evidence shows through clear
and convincing evidence that the proffered evidence is sufficiently relevant
and reliable to assist the jury in accurately understanding other evidence or
in determining a fact in issue.  Weatherred
v. State, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); Jordan v. State,
928 S.W.2d 550, 554B55 (Tex. Crim. App. 1996); Roise v.
State, 7 S.W.3d 225, 234 (Tex. App.CAustin 1999, pet.
ref=d).  To be considered reliable, evidence derived
from a scientific theory must satisfy three criteria: (1) the underlying
scientific theory must be valid; (2) the technique applying the theory must be
valid; and (3) the technique must have been properly applied.  Kelly, 824 S.W.2d at 573.  We also consider the following list of
non-exclusive factors in evaluating reliability: (1) acceptance by the relevant
scientific community; (2) qualifications of the expert; (3) literature concerning
the technique; (4) the potential rate of error of the technique; (5) the
availability of other experts to test and evaluate the technique; (6) the
clarity with which the underlying theory or technique can be explained to the
court; and (7) the experience and skill of the person applying the
technique.  Id.  








Rule 702 provides the various methods of
establishing an expert=s qualifications on a particular matter as
knowledge, skill, experience, training, or education.  Carter v. State, 5 S.W.3d 316, 319
(Tex. App.CHouston [14th Dist.] 1999, pet. ref=d).  In order to determine whether an expert
witness is qualified, we must measure the expertise against the actual subject
matter about which the expert is offering an opinion.  Roise, 7 S.W.3d at 234.  Additionally, the expert testimony must be
sufficiently tied to the facts of the case, so that it will aid the jury in
resolving a factual dispute.  Jordan
v. State, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996).  There must be a Afit@ between the
subject matter and the expert=s qualifications;
thus, the proponent must establish the expert has knowledge, skill, experience,
training, or education with respect to the specific issue before the
court.  Id.    

B.      Dr.
Mai

Dr. Mai was a resident and A.C.=s examining
physician at the emergency room in Galveston. 
He testified regarding the procedures used generally when examining a
child alleging sexual abuse, as well as the specific examination and findings
regarding A.C.  He testified that he did
not find any evidence of acute trauma to A.C.=s genitals or
evidence of sexual activity; however, he concluded that neither could be ruled
out.  Dr. Mai also testified that during
the examination, he did not have a device known as a colposcope, which
magnifies the genital area.  Appellant
then objected to any testimony regarding a colposcope, arguing Dr. Mai was not
qualified.  After a voir dire examination,
the trial court overruled appellant=s objection, and
Dr. Mai testified as follows:

Q.      Dr. Mai, what is a colposcope?

A.      It=s an instrument to magnify what we=re looking at.  It=s basically like a microscope except you don=t look at a slide.  You look at a large surface area.

Q.      And how is that used in the examination of
genitalia?

A.      It=s basically used to look at both the external and internal
genitalia.

Q.      And what is it used for specifically?

A.      Basically
to magnify what we=re trying to look at.

Appellant contends (1) Dr. Mai was not
qualified to discuss the colposcope, (2) the State failed to show the testimony
would aid the trier of fact, and (3) Dr. Mai failed to tie the facts of the
case to his testimony.  At trial,
however, appellant only objected to Dr. Mai=s qualifications;
therefore, we will limit our review of Dr. Mai=s testimony to the
objection made at trialCDr. Mai=s qualifications
to testify about the colposcope.  








Appellant specifically argues Dr. Mai was
not qualified to testify about the colposcope because he lacked experience
using the device and lacked personal knowledge in using, operating, and
handling the colposcope.  During voir
dire, appellant=s counsel questioned Dr. Mai about his
education and training.  Dr. Mai admitted
he did not have any special training at medical school regarding a colposcope
and that there was no colposcope in the emergency  room where he examined A.C.  Additionally, Dr. Mai testified he primarily
works at the children=s hospital, but that the children=s hospital did not
have a colposcope.  Based on this
testimony, appellant objected to Dr. Mai=s testimony,
arguing Dr. Mai never used a colposcope, was never trained regarding a
colposcope, and the device was not located at the place where he primarily worked.  

During the State=s voir dire
examination, Dr. Mai testified he was trained to collect sexual assault
evidence kits at the ABC Clinic.  While
at the clinic, Dr. Mai observed a colposcope being used and, as part of his
education and training, a doctor told him what a colposcope was and the purpose
of the device.  Dr. Mai testified he was
not trained on how to use the colposcope because he was not expected to use the
device.  The trial court allowed Dr. Mai
to testify about a colposcope, but limited his testimony to what the device was
and what it did.  

Rule 702 provides that an expert may be
qualified by knowledge, skill, experience, training, or education.  Tex.
R. Evid. 702.  During the voir
dire examination, Dr. Mai testified that as part of his training, he was told
what a colposcope was and what it did. 
The trial court limited Dr. Mai=s testimony to
those two specific areas; thus, the court properly tailored the testimony to
the expert=s actual qualifications.  We cannot say the trial court abused its
discretion in allowing Dr. Mai=s limited expert
testimony.  Accordingly, we overrule
appellant=s second issue.  

C.      Dr.
Lukefar








In his third issue, appellant contends the
trial court erred in admitting Dr. Lukefar=s testimony
regarding (1) the likelihood of bleeding during a female=s first sexual
intercourse, and (2) the ability to detect semen on clothing versus skin
surfaces.  On appeal, appellant
challenges both portions of Dr. Lukefar=s testimony,
claiming he was not qualified, the State failed to show the testimony would aid
the trier of fact, and Dr. Lukefar failed to tie the facts of the case to his
testimony.  We will first address
appellant=s challenge to Dr. Lukefar=s testimony
concerning the likelihood of bleeding during a female=s first sexual
intercourse. 

During trial, the State questioned Dr.
Lukefar about whether the absence of medical findings of trauma or physical
injury meant that sexual activity did not occur.  The State then asked Dr. Lukefar whether a
virgin always bleeds when she has sexual intercourse for the first time.  Dr Lukefar responded, ANo.  Actually there=s information in
the medical literature that probably only about half or maybe a little more
than half of woman [sic] actually have bleeding with their first - -.@  Appellant interrupted Dr. Lukefar, objecting
to the testimony on two grounds: (1) relevance; and (2) the reliability of the
other medical literature referred to by Dr. Lukefar.  

Appellant claims any testimony regarding
bleeding is irrelevant because there was no evidence A.C. bled the day of the
incident.  Texas Rule of Evidence 401
defines Arelevant evidence@ as evidence which
has Aany tendency to
make the existence of any fact that is of consequence to the determination of
the action more or less probable than it would be without the evidence.@  Tex.
R. Evid. 401.  This broad
definition of relevant evidence allows a liberal policy of admission of
evidence for the jury=s consideration.  Morales v. State, 32 S.W.3d 862, 865
(Tex. Crim. App. 2000).  Here, the State
argued, and A.C. testified, that she was a virgin when the incident
occurred.  Dr. Lukefar=s testimony was
relevant to explain lack of medical findings of trauma or physical injury and
to determine whether appellant and A.C. engaged in sexual intercourse.  Therefore, we hold the trial court did not
abuse its discretion in allowing Dr. Lukefar=s testimony
regarding bleeding during a female=s first sexual
experience on relevancy grounds.  








We next address whether the expert=s testimony
regarding bleeding satisfies the reliability prong.  We will use the Kelly factors, as
applicable, in evaluating whether Dr. Lukefar=s testimony
regarding bleeding was reliable.  Dr.
Lukefar is employed at the University of Texas Medical Branch (AUTMB@) as a
pediatrician, an associate professor in the department of pediatrics, and as
medical director of the ABC Clinic.  Dr.
Lukefar has been practicing medicine in the area of pediatrics for over twenty
years and has been teaching since 1993. 
He is board certified in pediatrics, has published papers in both
peer-reviewed and non-peer-reviewed journals, is a consultant to other
physicians and institutions, and is an authority in state medical societies on
issues related to child sexual abuse.  

Dr. Lukefar spends approximately fifty
percent of his time working at the ABC Clinic, which is a facility for
examining children that may be victims of child abuse or neglect.  Dr. Lukefar has been the medical director for
the ABC Clinic since 1996, and he also worked at a similar facility in Corpus
Christi beginning in 1995.  Approximately
seventy-five percent of the children who visit the clinic are alleged victims
of sexual abuse.  Dr. Lukefar has
examined approximately 3,000 children since 1995 who have alleged sexual
abuse.  

Dr. Lukefar also testified that he is
considered by his peers to be an expert in the area of child abuse
examinations.  He testified his opinions
are published for peer review, and the scientific field, pediatric medicine, is
generally accepted within the scientific community.  Dr. Lukefar stated that he knows and is
qualified to testify regarding the changes that could occur in a child=s sexual organ
when that child engages in sexual activity. 
Additionally, Dr. Lukefar trains the residents at UTMB on how to conduct
sexual assault examinations and evaluations of children.  After providing his credentials, Dr. Lukefar
then explained, with clarity, the different parts of the female sexual organ
and how engaging in sexual activity could affect a child=s sexual
organ.  

Applying the Kelly reliability
factors, Dr. Lukefar testified the scientific theory was widely accepted, he
has extensive credentials in the area of child sexual abuse victims, and he has
written articles in peer-reviewed journals. 
He explained his opinions with clarity, and his experience and skill
were well established.  Based on Dr.
Lukefar=s extensive
background, experience, and expertise in the area of pediatrics and child
sexual abuse, the trial court could reasonably conclude Dr. Lukefar=s testimony was
sufficiently reliable to aid the trier of fact to understand the effects from a
young female=s first sexual experience, and 








was admissible. 
Accordingly, we hold the trial court did not abuse its discretion in
allowing Dr. Lukefar to testify regarding the possibility of bleeding during a
female child=s first sexual intercourse. 

Appellant also contends Dr. Lukefar was
not qualified to testify on the subject of a child bleeding during her first
sexual experience.  Although Dr. Lukefar=s experience in
this area was well-established at trial, we do not need to reach this issue
because appellant failed to object to Dr. Lukefar=s qualifications
in the trial court.  Therefore, we hold
this point of error is waived.  Tex. R. App. P. 33.1(a).  

Appellant also challenges Dr. Lukefar=s testimony
regarding a physician=s ability to detect semen on clothing
versus skin.  Appellant contends the
State did not meet its burden to establish Dr. Lukefar was qualified or that
his testimony would aid the trier of fact. 
During trial, the State asked Dr. Lukefar whether there was Aany difference in
viewing sperm on a child=s body as opposed to on their clothing as
a general matter.@ 
Appellant objected, claiming Dr. Lukefar was not qualified to answer the
question because the subject was outside Dr. Lukefar=s area of
expertise, any testimony would be cumulative to the testimony previously given
by the serologist, and it was not relevant. 
The trial court overruled appellant=s objection.  








Whether an expert=s testimony will
aid the trier of fact requires a determination of the relevancy and reliability
of the testimony.  Roise, 7 S.W.3d
at 234.  Here, because appellant only
objected at trial to the relevancy of the testimony, we will not review Dr.
Lukefar=s testimony to
determine whether it was also reliable. 
The evidence is relevant if it has Aany tendency to
make the existence of any fact that is of consequence to the determination of
the action more probable or less probable than it would be without the
evidence.@  Tex. R. Evid. 401.  Additionally, when deciding whether the trial
court erred in admitting evidence for the jury=s consideration,
we apply the definition of relevant evidence broadly.  Morales, 32 S.W.3d at 865.  Here, whether sperm was found on A.C.=s skin or clothing
and a physician=s method of viewing and collecting sperm
directly relates to physical evidence that would make appellant=s guilt or
innocence more or less probable. 
Additionally, Dr. Lukefar discussed generally how to collect such
evidence and related that information to A.C.=s medical
records.  Therefore, we hold Dr. Lukefar=s testimony
regarding detecting semen on clothing versus skin would aid the trier of fact. 

Appellant also challenges Dr. Lukefar=s qualifications
to offer testimony concerning a physician=s ability to
detect semen on clothing and skin.  We
have previously detailed Dr. Lukefar=s extensive
experience in conducting examinations on children who are victims of sexual
abuse.  Dr. Lukefar also trains the
pediatric residents of UTMB how to conduct sexual  assault examinations and evaluations of
children, including collecting possible evidence from the children during the
examination.  He testified the purpose of
the examination and the collection of sexual assault evidence is to preserve
evidenceCfor example, semenCthat could
identify the perpetrator.  He also
testified he would be able to explain laboratory and forensic findings, as well
as how the samples are collected in an emergency room setting.  Given Dr. Lukefar=s knowledge,
skill, experience, training, and education, we cannot say the trial court
abused its discretion in allowing Dr. Lukefar to testify regarding detecting
semen on a child=s skin versus clothing.  

We overrule appellant=s third
issue.    

III.      Factual
Sufficiency








In his fourth issue, appellant contends
the evidence is factually insufficient to support the jury=s verdict.  We begin the factual sufficiency review with
the presumption that the evidence supporting the jury=s verdict is
legally sufficient.  Clewis v. State,
922 S.W.2d 126, 134 (Tex. Crim. App. 1996). 
In conducting a factual sufficiency review, we view all of the evidence
in a neutral light, without favoring either party.  Johnson v. State, 23 S.W.3d 1, 6B7 (Tex. Crim. App.
2000).  We will set aside the verdict
only if (1) the evidence supporting the verdict, considered by itself, is too
weak to support the finding of guilt beyond a reasonable doubt, or (2) contrary
evidence, if present, is strong enough that the beyond-a-reasonable-doubt
standard could not have been met.  Zuniga
v. State, No. 539-02, 2004 WL 840786, at *7 (Tex. Crim. App. Apr. 21,
2004); see Zuliani v. State, 97 S.W.3d 589, 593B94 (Tex. Crim.
App. 2003); Johnson, 23 S.W.3d at 11. 
When reviewing the evidence, we must give appropriate deference to the
jury findings in order to prevent intruding on the fact finder=s role as the sole
judge of the weight and credibility of the evidence.  Johnson, 23 S.W.3d at 7.  Therefore, unless the record clearly reveals
a different result is appropriate, we Amust defer to the
jury=s determination
concerning what weight to give contradictory testimonial evidence because
resolution often turns on an evaluation of credibility and demeanor.@  Id. at 8.   

In order to prevail, the State was
required to prove appellant intentionally or knowingly caused his mouth, anus,
or sexual organ to penetrate or contact A.C.=s sexual
organ.  Tex.
Pen. Code Ann. ' 22.011(a)(2)(C) (Vernon Supp. 2004).  We have previously detailed the factual
events that occurred on September 22, 2001, the day of the incident, in the
factual and procedural background section. 
A.C. testified appellant attempted to have sex with her by putting his
penis inside her, and that he stopped when she told him it was hurting
her.  Thereafter, he ejaculated on her
genitals.  Additionally, the scientific
evidence, Marylou=s testimony, and appellant=s ex-girlfriend=s testimony all corroborate
A.C.=s version of the
facts. 

Appellant relies on the fact that the
medical evidence was inconclusive regarding whether any sexual contact occurred
as well as the fact that no sperm was found in the genital area of the
complainant.  Appellant=s argument
challenges the weight to be given the testimony; however, the jury is the sole
judge of the credibility of the witnesses and the weight to be given the
evidence.  Jones v. State, 944
S.W.2d 642, 647B48 (Tex. Crim. App. 1996).  Viewing the evidence in a neutral light, we
cannot say the evidence of guilt, considered by itself, is too weak to support
the finding of guilt beyond a reasonable doubt, or the contrary evidence is
strong enough that the beyond-a-reasonable-doubt standard could 

 








not have been met. 
Accordingly, we hold the evidence is factually sufficient to support the
jury=s finding of
guilt.  We overrule appellant=s fourth
issue.    

IV.      Jury
Charge During Guilt/Innocence

In his fifth issue, appellant contends the trial court
erred by presenting a defective charge to the jury during the guilt/innocence
phase of trial.  He contends the charge
was defective because it was inconsistent with the indictment.  Specifically, appellant argues that because
the indictment alleged contact and penetration in the conjunctive, the jury
charge was defective because it charged the jury in the disjunctive rather than
the conjunctive.   Appellant also brings,
as part of this point of error, a second contention to the effect that by using
the phrase Acontact or penetration@ in the jury
charge, the trial court lowered or reduced the amount of proof required by the
State to prove appellant=s guilt beyond a reasonable doubt.  We disagree with both contentions.

A.  Charge
Error: Failing to Follow the Indictment

The indictment in this case provides appellant
intentionally and knowingly Acause[d] contact and
penetration of the female sexual organ of a child, [A.C.], who was not the
spouse of the Defendant, by the said BRIAN DAVID CROFT then and there using his
penis.@  (emphasis added).  The jury charge on guilt, however, provides A[n]ow if you find
from the evidence beyond a reasonable doubt that on or about the 22nd day of
September, A.D., 2001 in Galveston County, Texas, the Defendant, BRIAN DAVID
CROFT, did then and there  intentionally
or knowingly cause contact or penetration of the female sexual organ of
a child, [A.C.], who was not the spouse of the Defendant, by the said BRIAN
DAVID CROFT then and there using his penis . . . .@ (Emphasis
added).  








In Kitchens v. State, a capital murder case, the
court held that alternate pleading of the differing methods of committing one
offense may be charged in one indictment. 
823 S.W.2d 256, 258 (Tex. Crim. App. 1991).  Although the indictment may allege the
differing methods of committing the offense in the conjunctive, Kitchens
holds it is proper for the jury to be charged in the disjunctive.  Id.[2]  We overrule the first part of appellant=s fifth point of
error. 

B.  Charge
Error: Disjunctive Wording Reduced State=s Burden of Proof 

Appellant next contends that harmful error occurred because
the trial judge proceeded with a jury charge couched in the disjunctive as to
contact or penetration, following an indictment that charged in the conjunctive
as to contact and penetration.  As a result
of this alleged error, appellant argues the trial court lowered or reduced the
amount of proof required by the State to prove appellant=s guilt because
the jury was permitted to convict on either contact or penetration.  Appellant also contends that had the State
been required to prove its case as charged in the indictment, it is conceivable
that a jury may not have reached the same guilty verdict in light of the
evidence brought forward during the trial. 


Appellant fails to cite any authority supporting this
alleged error.  Tex. R. App. P. 38.1(h). 
Nothing is preserved for appellate review.  Moreover, the error is untenable in light of Kitchens
and other authority holding it is proper to charge the jury in the disjunctive.

 We overrule the
second prong of appellant=s fifth point of error.  Because we have overruled both parts of this
point of error, we overrule appellant=s fifth point of error.[3]








Conclusion

Having
overruled appellant=s five issues on appeal, we affirm
the judgment of the trial court.

 

 

 

/s/      John S. Anderson

Justice

 

 

 

 

Judgment
rendered and Opinion filed September 21, 2004.

Panel
consists of Justices Anderson, Hudson, and Draughn.[4]

Publish
C Tex. R. App. P. 47.2(b).

 











[1]  The
requirement that a person convicted of a Areportable
conviction or adjudication@ register as a sex offender is triggered by the
following events: discharge, parole, placement in a nonsecure community program
for juvenile offenders, or placement on juvenile probation, community
supervision, or mandatory supervision.  Tex. Code Crim. Proc. Ann. arts.
62.01(4), 62.03(a) (Vernon Supp. 2004). 
The requirement that such a person register is mandatory.  Tex.
Code Crim. Proc. Ann. art. 62.02(a) (Vernon Supp. 2004).  The jury charge on punishment incorrectly
described the probation condition that appellant register as a sex offender as
a condition the trial court Amay@ impose.  Had
appellant received a sentence making him eligible for community supervision,
appellant would have been required to register as a sex offender. Id.  Appellant, however, does not raise this issue
on appeal.  





[2]  Indeed,
appellant cites Kitchens in his brief and acknowledges that contrary
primary authority exists which holds that a conjunctive/disjunctive split
between the indictment and the jury charge is not error, and such authority Aresolves this point of error in the State=s favor.@  





[3]  We are aware
that in Francis v. State, 36 S.W.3d 121, 125 (Tex. Crim. App. 2000), the
Texas Court of Criminal Appeals held that it was error to charge the jury in
the disjunctive where the instances of indecency with a child occurred on
separate dates and constituted separate offenses against the same victim.  In Francis, the defendant argued that
the disjunctive jury charge allowed a conviction on less than an unanimous
verdict.  36 S.W.3d at 123.  The State had introduced evidence of four separate
incidentsBCtwo separate incidents when the defendant touched the
victim=s breasts, and two separate incidents when the
defendant touched the victim=s genitals.  Id.
at 124.  The State elected to pursue a
conviction based on two of the incidents, one involving touching the victim=s breasts and one involving touching the victim=s genitals, and the jury charge inquired whether the
defendant had Aengaged in sexual contact by touching the breast or
genitals.@  Id.  The Francis court held the disjunctive
jury charge allowed a conviction on less than an unanimous verdict.  Id. at 125.

Here, appellant has not raised the
unanimity issue in the trial court or on appeal, so the issue is not before
us.  Furthermore, unlike Francis,
the separate offenses in this case involve contact or penetration
of A.C.=s sexual organ with appellant=s penis.  The
offense of penetration necessarily includes contact.  See Vick v. State, 991 S.W.2d 830, 834
n.2 (Tex. Crim. App. 1999) (stating Apenetration
of the genitals necessarily includes contact.@).  There is no Francis error in this
case, because all of the jurors who believed there was penetration necessarily
also believed that antecedent contact had occurred, and a non-unanimous verdict
was not possible.





[4]   Senior
Justice Joe L. Draughn sitting by assignment.